## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH A. BARKER, Regional Director of Region 13 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, | ) ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 11 C 2383 |
| LATINO EXPRESS, INC., | ) ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION

Petitioner Joseph A. Barker, Regional Director for Region 13 of the National Labor Relations Board (the "Director"), seeks injunctive relief pursuant to § 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(j), against respondent Latino Express, Inc., pending the resolution of charges currently before the National Labor Relations Board (the "Board"). For the reasons explained below, we grant the Director's petition.

### BACKGROUND

In January 2011, Carol Garcia and Pedro Salgado filed separate charges with the Board alleging that Latino Express had violated §§ 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3). In March 2011, Teamsters Local Union No. 777 (the "Union") filed charges with the Board predicated on some of the same alleged

- 2 -

conduct. After investigating the charges, the Board's Acting General Counsel consolidated the cases and issued a consolidated complaint and notice of hearing. In April 2011, Administrative Law Judge ("ALJ") Michael A. Rosas conducted a three-day evidentiary hearing on the charges. The ALJ issued his decision on July 12, 2011, finding that Latino Express had violated the Act. The following facts are drawn from the transcripts of the administrative hearing, additional exhibits submitted to the court by the parties, and the ALJ's summary of the facts.

Latino Express operates a bus transportation business in Chicago, Illinois. The company busses students pursuant to a contract with the Chicago Public Schools ("CPS"), and provides charter bus transportation to members of the general public. Latino Express admits that it is an "employer" under the Act. (See Decision, dated July 12, 2011 (hereinafter, "ALJ Decision"), attached as Ex. 1 to the Director's Mot. to Supp. the Record with the Decision of the ALJ, at 2.) The company is owned in equal one-third shares by Michael A. Rosas, Sr. (its president), Henry Gardunio (its vice president), and Joseph Gardunio, Sr.[1] Henry Gardunio is responsible for the company's day-to-day operations. In or around September 2010, Latino Express employees met informally amongst themselves to discuss their grievances. (See

_____

[1]  We will refer to Henry Gardunio as "Gardunio" for the sake of convenience, as Joseph Gardunio, Sr. plays only a bit part in the events as described at the evidentiary hearing.

- 3 -

Trans. of Hearing at 354-55; see also id. at 87, 119.)  Then, in November 2010, a Latino Express driver named Frank Hernandez contacted Elizabeth Gonzalez, an organizer affiliated with the Union.  Using union authorization cards that Gonzalez provided, Hernandez obtained signatures from other drivers including Carol Garcia and Pedro Salgado.  Salgado, in turn, joined Hernandez in soliciting further signatures.

### 1. Meeting with Union Representatives on December 9, 2010

On December 9, 2010, Gonzales and two other union representatives met with a group of employees at a restaurant approximately one block from Latino Express's premises.  Those employees included Hernandez, Salgado, Carol Garcia, and Pedro Garcia.  At the meeting, Gonzales received 27 signed authorization cards and gave the employees more cards to distribute.  When the meeting ended around 6:00 p.m., the Union representatives (wearing jackets and hats emblazoned with the Teamsters insignia) and the employees exited the restaurant.  Hernandez, Salgado, Carol Garcia, and Pedro Garcia all testified that as they were leaving they saw Sara Martinez, the company's dispatcher/manager, stopped at a red light in a company vehicle.  Martinez was sitting approximately 20 feet from where they were standing outside the restaurant.[2]  The

---

[2]/  Hernandez estimated that the distance between himself and Martinez was between 40-50 feet, but also indicated that the distance was comparable to the distance between where he was sitting during his testimony and the back wall of the room where the hearing was held.  (Trans. of Hearing at 445-47.)  Counsel for both parties estimated that that distance was 20 feet.  (Id. at 73.)

- 4 -

drivers each testified that they made eye contact with Martinez. (Trans. of Hearing at 92, 265, 360, and 447.) Martinez did not testify at the hearing, but states in an affidavit filed with this court that she did not make eye contact with the employees and did not see anyone wearing Union apparel. (See Martinez Aff. ¶ 3.) But she saw the individuals leaving the restaurant clearly enough to identify them as Latino Express employees. (Id. at ¶ 1 ("I saw some employees on a restaurant's premises. The restaurant is next door to the Company.").) It is also undisputed that she told Gardunio what she had seen, although she claims that she did not identify the employees by name. (Id. at ¶ 3 ("I did not identify for Henry Gardunio the persons by name."); see also Trans. of Hearing at 612, 692-94.) In his decision, the ALJ stated that "[w]ithout Sara Martinez' testimony to shed a different light, I found it suspicious that she would simply tell Gardunio that she observed a group of employees leaving a restaurant and nothing else." (See ALJ Decision at 5 n. 19.) Even with the benefit of Martinez's testimony, her and Gardunio's accounts are dubious. Neither witness has supplied any context that would make such a stilted conversation seem plausible.

**2. December 10, 2010**

**a. Meetings with Management**

Pedro Garcia testified that the day after the meeting at the restaurant with Union representatives he was called in to speak

- 5 -

with Victor Gabino, the company's maintenance director.  Gabino told him that he had learned about the Union's organizing efforts and that many of the drivers were upset by that activity.  Garcia indicated, albeit somewhat vaguely, that he supported the union. (Trans. of Hearing at 97 ("I told him yes, the drivers were upset, and I had to support them because I was also a driver.  And anything that would benefit them would benefit me, and anything that would affect them would affect me.").)  Gabino told him "that's fine, but he said just think about it very well."  (Id. at 98.)  Gabino, like Martinez, did not testify at the hearing but has submitted an affidavit to this court.  In it, he admits to speaking with Pedro Garcia around December 10, 2010, but denies making any statements about the Union.  (Gabino Aff. ¶¶ 1-3.)  Instead, he states that they spoke about some unidentified "Latino [Express] business."  (Id. at ¶ 3.)  Later that same day, Pedro Garcia and at least two other co-workers were summoned to a meeting with several managers and supervisors, including Michael Rosas, Sr., Michael Rosas, Jr., and Martinez.  Pedro Garcia testified that Rosas, Jr. told the employees that the company was aware of the employees' organizing campaign.  In addition, Garcia testified that he was challenged by Martinez and another driver when he suggested that other companies have unions.  (See Trans. of Hearing at 102.)  The meeting participants discussed employee benefits, either in the form of increased wages for standby drivers (which Pedro Garcia

favored) or two weeks paid vacation (proposed by Rosas, Jr.). Rosas, Jr. indicated that he would consider the matter and convene a meeting after the holiday break.

### b. Gardunio Fires Carol Garcia

On the same day these meetings took place, and the day after Carol Garcia and other employees met with Union representatives, Gardunio fired Garcia purportedly because she had threatened him. The circumstances of the alleged threat are as follows. In June 2010, Garcia caused an accident while driving a Latino Express vehicle that resulted in approximately $4,000 in damages to the other driver's car. Sometime in September 2010, Melissa Morales, a clerical assistant, gave Garcia a bill for $800, or approximately 25% of the total cost of the accident to the company. This was consistent with the company's policy, which was apparently adopted to avoid making insurance claims. Garcia challenged Gardunio about the bill, telling him that the company's policy was unfair and that it was adopted because the company did not carry insurance during the summer months. She stated that she knew this from her own experience driving charters during the summer, and because "drivers talk." (Trans. of Hearing at 235.) Gardunio instructed her not to speak about these matters with other drivers. (Id. ("[H]e knew that I knew a lot stuff with the company was not right, and I should not be talking about the drivers about the company, and that I should not be talking to the drivers with things that happens

here.").)  At some point during this conversation, which lasted approximately an hour, she told Guardino that "the drivers were talking, that they wanted to put a union in there."  (Id. at 235-36.)  Guardino responded, "that will never happen, the CPS do not allow none of that companies to have unions and that, that that was never going to happen."  (Id. at 236.)[3]  Guardino eventually offered to reduce Garcia's contribution by half, to $400, and she reluctantly accepted.  He told her, however, not to disclose the agreement to the other drivers and to stop "riling" them up.  (Id. at 241-42.)  While largely adopting Garcia's version of this conversation, the ALJ credited Gardunio's testimony that Garcia warned him that he "would pay for this" and that "[w]hen somebody plays with my money, I get them back."  (ALJ Decision at 7.)

Returning to the events of December 10, 2010, Gardunio summoned Garcia to a meeting in the dispatcher's office and gave her a violation notice terminating her employment.  The notice stated that the company was terminating her for threatening Gardunio during their September meeting.  (See GC Ex. 6.)  Gardunio testified that he acted when he did, approximately three months

---

[3]  There is evidence in the record that Gardunio made a similar statement in late January or early February 2011.  Pedro Garcia and Hernandez testified that Gardunio told them that CPS did not like to do business with companies with unionized employees, and that the increased labor costs would cause the company to lose the CPS contract, resulting in lay-offs. (Trans. of Hearing at 112, 456-57.)  Hernandez testified that around that same time Gabino told him that the company might close its Chicago facility and relocate elsewhere to avoid the Union.  (See id. at 457-58.)  Gabino denies that he made this statement.  (See Gabino Aff. at 5.)

after the threat, because of a conversation he had with a police officer at a community patrol meeting. According to Gardunio, he spoke with the officer about an incident in which Gardunio was physically attacked by someone two years after that same person verbally threatened him. The officer told him, "[y]ou can't let those things go by because eventually it's going to come to this. So you need to nip this in the bud." (Trans. of Hearing at 688.) Gardunio claims that this conversation motivated him to fire Garcia.

### 3. **January 6, 2011**

On January 6, 2011, management convened a meeting with the company's employees. Gardunio announced a 50-cent hourly wage increase for drivers, and proposed that employees form a committee with which he would meet to discuss their concerns about the company.[4] He also announced that going forward the company was changing the way that it assigned charters. These assignments were desirable because they gave drivers an opportunity to earn extra money: drivers who drove chartered busses were entitled to retain one-third of the company's charter fee. Before the policy change, charter assignments were doled out by the "charter director," Raymundo Del Toro, in his complete discretion. Gardunio announced

---

[4] Salgado testified that on January 7, 2011 Gabino similarly suggested that employees form their own committee to bring their grievances to management, emphasizing that union dues were expensive. (See Trans. of Hearing at 369-71.) Gabino denies that he made these statements. (See Gabino Aff. ¶ 4.)

that Del Toro was no longer in charge of charter assignments, which going forward would be assigned by seniority. What Gardunio did not tell employees at the meeting was that he had fired Del Toro for stealing charter payments. Del Toro admits that he deposited payments from charter customers in his own bank account, retaining the portion that would ordinarily go to the company and paying the drivers their one-third share in cash. On one occasion in October 2010 Del Toro paid Salgado cash for driving a chartered bus. Salgado testified that he performed the charter assignment, but later noticed that his paycheck did not reflect the payment he was owed. He brought the matter to Del Toro's attention, who gestured to him to be quiet and told him to return later that afternoon. When Salgado returned as directed, Del Toro gave him a $100 bill. Salgado thought the transaction was suspicious — he had never received cash for a charter before — but he "assumed it was okay because they [the company] owed me that money." (Trans. of Hearing at 389.)

The witnesses agree that Salgado introduced the subject of cash payments for charters at the January 6, 2011 meeting. But they disagree about what he said and what his statements signified. According to Gardunio, Salgado complained that he was owed $500 after Gardunio disclosed that Del Toro was no longer charter director. Salgado states that he told Gardunio at the meeting that the drivers had heard rumors that Del Toro was "paying under the

table." (Trans. of Hearing at 368; see also id. at 449-52 (Hernandez testifying that he spoke with Salgado before the meeting about raising that very issue).) According to Salagado and Hernandez, they wanted Gardunio to address the issue because they believed that Del Toro was playing favorites. (See id. at 420 (Salgado testifying that he believed Del Toro was giving the coveted charter assignments to his cronies who accepted cash); id. at 450 (Hernandez testifying that "there was favoritism for some drivers over others"); see also id. at 87 (Pedro Garcia testifying that the employees convened a meeting in late 2010 to propose topics to raise with the union, including "better distribution of the charters").) Gardunio claims that Salgado effectively confessed to theft in a front of his boss and a room full of his co-workers. According to Gardunio, a driver "steals" money from the company if he or she accepts cash payment for a charter and "if we [presumably the company] do not know about this cash." (Id. at 612-14; see also Gardunio Aff. ¶¶ 1-2.) The ALJ called Gardunio's definition "not credible." (ALJ Decision at 9 n.36.) We find it incoherent. No witness contradicted Salgado's testimony that he actually performed the charter services that Del Toro assigned to him and that the company's charter policy entitled him to one-third of the charter fee. Del Toro, a company manager, paid him $100 in cash for his services (a few dollars short of what he was actually owed, see Trans. of Hearing at 386). It is possible that Salgado

- 11 -

knew what Del Toro was doing with the company's portion of the fee, but he credibly testified that he did not know, and Del Toro did not testify otherwise.[5]  In any event, according to Gardunio, Salgado's knowledge was irrelevant — merely accepting the money was theft.  Indeed, Gardunio testified that the only basis he had for believing that Salgado was a thief was Salgado's alleged statement that Del Toro owed him money.  (Trans. of Hearing at 616-18.) Gardunio eventually determined that 12 drivers received cash payments from Del Toro.  Some of those drivers were given the opportunity to return the payments, some were placed on "probation," and others were not disciplined.  Only Salgado was summarily fired, on January 12, 2012.[6]

The ALJ concluded that Latino Express unlawfully interfered with its employees' rights under the Act and wrongfully terminated Garcia and Salgado.  (See ALJ Decision at 10-17.)  To remedy these violations, the ALJ recommended that the Board order Latino Express to cease and desist its § 8(a)(1) violations and reinstate Garcia and Salgado with backpay and any other lost benefits.  (Id. at 18-19.)  The Director seeks injunctive relief pending the Board's

---

[5]/  In response to Latino Express's counsel's leading questions, Del Toro testified that the drivers "participate[d]" in the theft by giving the charter money to him and accepting cash payments.  (Trans. of Hearing at 326-27.)  But he did not testify that he told drivers that he was pocketing the company's portion of the fee.

[6]/  Gardunio indicates in his affidavit that he fired the other employees involved at some unspecified point before executing his affidavit in September 2011.  (Gardunio Aff. ¶ 6.)  But they were still employed by the company in late April 2011, when the ALJ conducted the hearing on the Acting General Counsel's complaint.

- 12 -

final determination.

## DISCUSSION

Section 10(j) of the Act authorizes a district court to grant temporary injunctive relief pending the Board's final resolution of unfair labor practice proceedings if such relief would be "just and proper." 29 U.S.C. § 160(j). Relief under § 10(j) should be granted "only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1566 (7th Cir. 1996). "The court looks to the same factors to which it looks in other contexts when deciding whether to grant injunctive relief . . . ." Lineback v. Spurlino Materials, LLC, 546 F.3d 491, 499-500 (7th Cir. 2008). Thus, the Director is entitled to interim relief when: (1) the Director has a reasonable likelihood of prevailing on the merits of the complaint; (2) there is no adequate remedy at law; (3) "the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction;" and (4) public harm would occur in the absence of interim relief. Id. at 500 (quoting Bloedorn v. Francisco Foods, Inc., 276 F.3d 270, 286 (7th Cir. 2001)). The Director bears the burden of establishing the first, second, and fourth elements by a preponderance of the evidence. Id. We evaluate the third element on a sliding scale: the better the

- 13 -

Director's case on the merits, the less his burden to prove irreparable harm, and vice versa. Id. We have no jurisdiction to rule on the merits of the underlying case before the Board; rather, our "mission is to determine whether the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual." Electro-Voice, 83 F.3d at 1567.

Latino Express argues generally about the standards governing preliminary injunctions, but it does not address the record in any meaningful way. First, it argues that we should completely disregard the ALJ's decision when evaluating the Director's likelihood of success, which is not the law in this Circuit. See Spurlino, 546 F.3d at 502 n.4 ("The ALJ is the NLRB's first-level decisionmaker, and, having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.") (internal quotation marks and brackets omitted). Second, and this appears to the real thrust of its response to the Director's petition, Latino Express argues that it is "imperative" that we conduct a plenary hearing in this court before ruling on the petition. (Latino Express's Resp. at 12.) At a couple points in its brief, Latino Express suggests that the Supreme Court requires such a hearing. (See id. at 4 ("The Acting General Counsel's

- 14 -

support fails to invalidate the U.S. Supreme Court's position. Therefore the Acting General Counsel's Motion should be denied and this Court should hear evidence."); see also id. at 12.) But it is not clear which Supreme Court case it is referring to, and our Court of Appeals has indicated, at least implicitly, that we may issue a § 10(j) injunction based solely on the administrative record. See Electro-Voice, 83 F.3d at 1566 (observing that the district court did not hear live testimony, without suggesting that this was somehow improper); see also Francisco Foods, 276 F.3d at 287 (similar); Barker v. A.D. Conner Inc., 807 F.Supp.2d 707, 711 n.4 (N.D. Ill. 2011) (granting petition for injunctive relief based upon the administrative record without an evidentiary hearing in the district court); Barker v. Regal Health and Rehab Center, Inc., 632 F.Supp.2d 817, 836 (N.D. Ill. 2009) (case in which we granted the Director's petition based only on the administrative record). The Electro-Voice Court did go on to say that "[b]ecause the district court did not have the opportunity to observe the demeanor of the witnesses, we need not be especially reluctant to hold that the district court reached clearly erroneous results." Id. at 1566 n.15. But the Court simply meant that it had no occasion to defer to the district court's credibility determinations, not that the absence of live testimony was itself erroneous. Instead, it appears from Electro-Voice and Francisco Foods that we have discretion to receive evidence outside the administrative record.

See Order, Barker v. A.D. Conner, Inc., No. 11 C 2255 (N.D. Ill. May 11, 2011) (DKT # 62), at 3 (Judge Dow concluding in a well-reasoned order that the district court has discretion whether or not to receive additional evidence).

Consistent with that discretion, we received additional affidavits from Latino Express and left open the possibility that we would conduct a hearing after reviewing the administrative record and the parties' submissions. (See Minute Order, dated July 20, 2011, (DKT # 19).) We have now reviewed those materials and see no reason to conduct a further hearing. Latino Express has provided affidavits from three witnesses: Gardunio, Martinez, and Gabino.[7] Their affidavits exclusively address the merits of the Director's case. For example, Gabino states that he did not tell Pedro Garcia that he was aware of the Union's organizing efforts, contrary to Garcia's testimony at the hearing. (See Gabino Aff. ¶ 1.) But the question here is not whether we find the Director's witnesses credible, but instead whether the Board will find that they are credible. See Order, Barker v. A.D. Conner, Inc., No. 11 C 2255 (N.D. Ill. May 11, 2011) (DKT # 62) ("The salient point is that the ultimate determinations on whether the witnesses are credible and whether the Act has been violated are made by the Board, not the district court on a motion for preliminary relief under Section 10(j)."). Consequently, if there is support in the

---

[7] Latino Express has not offered any explanation for why it did not call Martinez and Gabino during the hearing before the ALJ.

- 16 -

record for the ALJ's credibility determinations, then the possibility that we might reach a different conclusion after hearing live testimony is irrelevant.  See Electro-Voice, 83 F.3d at 1570 ("Our presentation of the evidence herein is focused on the strength of the Director's evidence only because our inquiry is limited to whether the Director has a better than negligible chance of success. Our holding is similarly limited to a finding that the Director has such a chance."); see also Francisco Foods, 276 F.3d at 287 (the court will "credit the Director's factual averments so long as they are plausible in light of the record evidence").  As for the other preliminary injunction factors, Latino Express has not provided any relevant argument or evidence in response to the Director's petition.  In sum, it has failed to show that a further hearing is necessary, and we will proceed to decide the Director's petition based upon the materials already before the court.

## A.   Likelihood of Success

"Evaluating the Director's likelihood of success calls for a predictive judgment about how the NLRB is likely to rule." Spurlino, 546 F.3d at 502 n.4.  The Director makes a showing of a likelihood of success by demonstrating that his chances are "better than negligible."  Id. at 502.  The ALJ concluded that the Acting General Counsel had successfully shown each of the violations alleged in its consolidated complaint. (See First Am. Consolidated Compl. and Notice of Hearing, attached as Ex. 5 to the Director's

- 17 -

First Am. Petition for Prelim. Inj., at 2-3.)  Based upon our own evaluation of the record, we find no basis to predict that the Board will reach a different decision.

**1.  Section 8(a)(1)**

"It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."  29 U.S.C. § 158(a)(1).  Section 157, in turn, guarantees employees the rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ...."  29 U.S.C. § 157.  The Board's test for determining whether an employer's communications with employees interfere with employees' statutory rights is an objective one; the employer's motive in making the statements is irrelevant, as are the effects.  Miller Elec. Pump & Plumbing, 334 NLRB 824, 824 (2001).  As the Director points out, the ALJ found § 8(a)(1) violations based on "well established" categories of prohibited conduct: (1) unlawfully creating an impression of surveillance; (2) promising improved benefits in order to discourage union support; (3) soliciting grievances during an organizing campaign and implicitly promising that those grievances would be remedied; (4) interrogating employees about their union activities; (5)

- 18 -

threatening to discharge employees if they unionized; (6) prohibiting employees from speaking about the company's accident-reimbursement policy; (7) threatening to close the company's Chicago facility if the employees unionized; and (8) suggesting to employees that their unionizing activities were futile.  (ALJ Decision at 10-15.)

> **a.  Impression of Surveillance**

An employer violates § 8(a)(1) when it makes statements creating the impression that it is monitoring the union activities of its employees.  See Haynes Motor Lines, 273 NLRB 1851, 1855 (1985) ("Such conduct is clearly coercive and clearly intimidates the employees in the exercise of their rights guaranteed by Section 7.").  Carol Garcia testified that Gardunio told her and other drivers that he would "kick [them] out" if he discovered that they were "gathering" and participating in "those private meetings." (Trans. of Hearing at 250.)  We infer from the context of her testimony that "those private meetings" referred to the drivers' early organizational meetings, prior to the meeting with union officials in December.  Pedro Garcia testified that he was called into Gabino's office on December 10, 2010, the day after he and other employees met with union representatives.  (Id. at 95-97.) Gabino told him "that he [Gabino] understood that a lot of the drivers were upset and that he had found out that we were wanting

- 19 -

to get the union in." (Id. at 97.)[8]  The Board has held in prior
cases that similar statements create an unlawful impression of
surveillance.  See, e.g., Emerson Elec. Co., 287 NLRB 1065, 1065
(1988) (impression of surveillance created by a plant manager's
statement to an employee, "I'm aware of the fact that you've
attended some meetings and you've expressed an interest in the
union.") (internal quotation marks omitted).  Indeed, Gardunio's
and Gabino's statements are more explicit than other statements
that the Board has found impermissible.  See, e.g., Tres Estrellas
de Oro, 329 NLRB at 50-51 ("Guzman asked Monroy if he was a
politician.  When Monroy said that he did not understand what
Guzman was saying, Guzman replied, 'Don't be naïve, I know what you
wanted to do, you want to do a work stoppage [or] a strike.");
Jennie-O Foods, 301 NLRB 305, 338-39 (1991) ("I hear you're getting
into politics too.").

> **b.  Promising Improved Benefits During a Union Organizing
> Campaign**

"The announcement, promise, or grant of benefits in order to
discourage union support is unlawful."  In re Curwood, Inc., 339
NLRB 1137, 1147 (2003) (*order rev'd in part on other grounds by*
N.L.R.B. v. Curwood Inc., 397 F.3d 548, 556-58 (7th Cir. 2005));
see also N.L.R.B. v. Exchange Parts Co., 375 U.S. 405, 409 (1964)
("The danger inherent in well-timed increases in benefits is the

---

[8]/  As we previously noted, Gabino denies that he made this statement.  But
it is enough for our purposes that Garcia's testimony is plausible.

suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged."). "Absent a showing of a legitimate business reason for the timing of a grant of benefits during an organizing campaign, the Board will infer improper motive and interference with employee rights under the Act." Yale New Haven Hosp., 309 NLRB 363, 366 (1992). However, the Acting General Counsel must show that the employer knew that employees were organizing to establish a § 8(a)(1) violation based upon improved employee benefits. See Norfolk Livestock Sales Co., 158 NLRB 1595, 1595 (1966) (finding no § 8(a)(1) violation where the General Counsel failed to show that the employer knew that its employees were organizing when it announced improved vacation benefits).

The ALJ found that management's promise to increase benefits at the January 6, 2011 meeting interfered with its employees' rights under the Act. (ALJ Decision at 11.) There is evidence in the record that management knew that employees were organizing before that meeting. (See, e.g., Trans. of Hearing at 95-97, 250.) And the subject of union representation was discussed at the December 10 meeting where management first raised the possibility of increasing wages. (See id. at 103-04.) The record supports the inference that management announced the improved benefits to stymie the organizing campaign, and Latino Express has not articulated any

legitimate business reason for increasing wages when it did.  Cf.
Yale New Haven Hosp., 309 NLRB at 366 (A legitimate business reason
"may be established by a showing that the benefits were granted in
accordance with a preexisting established program.").

### c.  Solicitation of Grievances

"Absent a previous practice of doing so . . . the solicitation
of grievances during an organizational campaign accompanied by a
promise, expressed or implied, to remedy such grievances violates
the Act."  Capitol EMI Music, 311 NLRB 997, 1007 (1993).  "[T]he
fact an employer's representative does not make a commitment to
specifically take corrective action does not abrogate the
anticipation of improved conditions expectable for the employees
involved."  Id.  At the January 6, 2011 meeting, Gardunio suggested
that employees form a committee to bring their grievances to
management.  (Trans. of Hearing at 108, 363, 482.)  The Board has
found that similar proposals violate § 8(a)(1), even where (unlike
this case) the employees themselves propose forming the committee.
See House of Mosaics, Inc., 215 NLRB 704, 704 (1974) (employer
violated § 8(a)(1) when he "endorsed" and "fostered" his employees'
proposal to form a non-union grievance committee).

### d.  Employee Interrogation

An employer unlawfully interrogates an employee if his
questioning is coercive or tends to interfere with the employee's
rights under the Act.  See Rossmore House, 269 NLRB 1176, 1177

- 22 -

(1984). The Board considers the "totality of the circumstances" to determine whether the employer's questioning is unlawful. See id.; see also Cumberland Farms, Inc., 307 NLRB 1479, 1479 (1992). Sometime in February 2011 management brought in a "guest speaker" to address employees about the disadvantages of unionization. (See Trans. of Hearing at 454; 629-30.) Hernandez testified that he and a group of other drivers were having a discussion after this meeting when Gardunio approached them. (Id. at 456.)[9] Hernandez was wearing a union t-shirt, and Gardunio said, "why are you wearing union shirt, that's why you're making the drivers mad." (Id.) In that same conversation, Gardunio told Hernandez and the other drivers that the company would have to bid higher for the CPS contract if the employees joined the Union, and that the company "would have no choice [but] to let drivers go." (Id.) We believe that the Director has shown a better than negligible chance that the Board will find that Gardunio's questioning (although brief) was unlawful. Gardunio, one of the company's co-owners and the person in charge of its day-to-day operations, approached Hernandez and the other drivers shortly afer a company-sponsored anti-union speaker attempted to address employees. Gardunio testified that

---

[9] The ALJ credited Pedro Garcia's testimony that Gardunio approached the drivers over Gardunio's testimony that the drivers invited him to join them. We see no basis in the record to predict that the Board will reach a different conclusion. (See ALJ Decision at 9-10 n.38 ("Gardunio's contention that he was invited was significantly contradicted by his pretrial affidavit and was, therefore, not credible."); see also Trans. of Hearing at 703-06 (Gardunio admitting that his pretrial affidavit stated only that he approached the drivers, not that they invited him to participate).)

the speaker was effectively prevented from speaking by pro-union employees, and that he (Gardunio) had been summoned from his office to order an employee to stop filming the event. (Id. at 673-74, 676.)  This testimony suggests that the atmosphere was charged when Gardunio approached Hernandez and the other employees.  Moreover, the statement itself ("that's why you're making the drivers mad"), coupled with Gardunio's statement about the CPS contract, strongly suggest that Gardunio's question was aimed to drive a wedge between Hernandez and the other drivers.  Taking into account the totality of the circumstances, the Board could find that Gardunio's interrogation was coercive and/or intimidating.

### e.  Threats of Discharge and Plant Closure

The ALJ concluded that Gardunio's statements about the likely consequences of unionization — losing the CPS contract and thereby causing the company to lay off workers — "represented threats not made on the basis of objective fact."  (ALJ Decision at 13 (citing Patsy Bee, Inc., 249 NLRB 976, 977 (1980) (enforcement denied by Patsy Bee, Inc. v. N.L.R.B., 654 F.2d 515, 517-18 (8th Cir. 1981).)  He similarly concluded that the company violated § 8(a)(1) when Gabino told Hernandez that the company would close the facility if the employees unionized.  (See id. at 14.)  Employers may not threaten employees with termination in retaliation for exercising their rights under the Act, but they have a right to make their case why employees should not unionize.  See N.L.R.B. v. Village

- 24 -

IX, Inc., 723 F.2d 1360, 1367 (7th Cir. 1983) ("[I]t is apparent
from section 8(c) of the Act (on which see NLRB v. Golub Corp., 388
F.2d 921, 926-28 (2d Cir.1967)), and from the use of the electoral
process to determine representation, that the company has a right
to state its side of the case.").[10] "Since the only effective way
of arguing against the union is for the company to point out to the
workers the adverse consequences of unionization, one of which
might be closure, it is often difficult in practice to distinguish
between lawful advocacy and threats of retaliation." Id. In
Village IX, the Court ruled that an employer is not required to
provide a detailed and thoroughly researched basis for its
prediction that unionization would be bad for the company. Id. In
that case, the Court concluded that the employer had "provided
objective support for his prediction of the consequences of
unionizing Shenanigans by pointing to the competitive nature of the
restaurant business and to the fact that only one restaurant in
Decatur was unionized and it was doing badly." Id. at 1368. This
does not strike us as a difficult standard to satisfy, but Latino
Express has not cited any evidence in the record establishing an
objective basis for Gardunio's naysaying. Nor does it attempt to
show that Gabino had an objective basis for his statement to

_____

[10]/ Section 8(c) provides that "[t]he expressing of any views, argument,
or opinion, or the dissemination thereof, whether in written, printed, graphic,
or visual form, shall not constitute or be evidence of an unfair labor practice
under any of the provisions of this subchapter, if such expression contains no
threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

- 25 -

Hernandez that the company would be forced to change locations if the employees unionized. (Trans. of Hearing at 457-58.)[11] The Board could find on this evidence that Latino Express violated § 8(a)(1).

### f. Prohibiting Employees from Speaking About the Accident Reimbursement Policy

The ALJ concluded Gardunio's statement to Garcia, directing her not to discuss with other employees their agreement to reduce her liability for the bus accident, was unlawful. This case resembles Westside Community Mental Health Center, 327 NLRB 661, 666 (1999), where the Board concluded that an employer violated the Act by instructing an employee not to discuss her suspension with other employees. The Board, adopting the ALJ's finding, concluded that "a rule prohibiting employees from discussing their alleged misdeeds which resulted in discipline with other employees 'constitutes a clear restraint on employees right to engage in concerted activities for mutual aid and protection concerning undeniably significant terms of employment.'" Id. (quoting Pontiac Osteopathic Hospital, 284 NLRB 442 (1987)). The company's accident reimbursement policy, and its apparent willingness to alter that policy when it was expedient to do so, were "significant terms of

---

[11] The transcript of Hernandez's testimony is somewhat confusing. (Trans. of Hearing at 457 ("He [Gabino] said that if we bring the union, the union would move the — another location move their stuff where they would go. And he said he will, he will have his job secure with the company.").  But the ALJ, who had the benefit of hearing the testimony live, clearly understood him to say that Gabino told him that the company would move locations if the employees unionized. (ALJ Decision at 10, 14.) And Latino Express has not articulated any other interpretation.

employment." Id. Once again, Latino Express offers no counter-argument.

### g. Statements of Futility

An employer violates § 8(a)(1) by telling employees that it would be futile to join or support a union. See Rood Indus., 278 NLRB 160, 164 (1986). In Rood, the Board concluded that an employer violated § 8(a)(1) when its president stated in remarks to employees that he would not "'run an organized [i.e., unionized] shop.'" See id. Carol Garcia testified that she told Gardunio that the drivers wanted to join the Union, and that Gardunio responded: "that will never happen, the CPS do not allow none of that companies to have unions and that, that that was never going to happen." (Trans. of Hearing at 236.) This statement is comparable to the statement that the Board found unlawful in Rood.

In sum, the Director has shown a better than negligible chance that the Board will conclude that Latino Express violated § 8(a)(1). In particular, the Director has made a strong showing that management's statements at the December 10 and January 6 meetings interfered with employees' rights under the Act.

### 2. Section 8(a)(3)

Section 8(a)(3) prohibits employers from terminating employees for engaging in union activities. To establish a § 8(a)(3) violation, the Director must first show by a preponderance of the evidence that the employee's protected conduct was a motivating

- 27 -

factor in the employer's decision. <u>In re American Gardens Management Co.</u>, 338 NLRB 644, 645 (2002). The Director satisfies this initial burden by establishing: (1) that the employee engaged in protected activity, (2) that the employer knew of that activity, (3) that the employer took adverse action against the employee, and (4) "a motivational link, or nexus, between the employee's protected activity and the adverse employment action." <u>Id.</u> With respect to this last element, "the Board looks to such factors as inconsistencies between the proffered reason for the discipline and other actions of the employer, disparate treatment of certain employees compared to other employees with similar work records or offenses, deviation from past practice, and proximity in time of the discipline to the union activity." <u>In re West Maul Resorts</u>, 340 NLRB 846, 848 (2003). If the Director makes this showing, the burden shifts to the employer "to demonstrate that the same action would have taken place even in the absence of the protected conduct." <u>Id.</u> (citation and internal quotation marks omitted). "However, if the evidence establishes that the reasons given for the Respondent's action are pretextual — that is, either false or not in fact relied upon — the Respondent fails by definition to show that it would have taken the same action for those reasons, absent the protected conduct . . . ." <u>In re Golden State Foods Corp.</u>, 340 NLRB 382, 385 (2003).

**a. Carol Garcia**

- 28 -

The record supports the conclusion that Carol Garcia engaged in protected activity, and that the company was aware of that activity prior to terminating her on December 10, 2010. First, there is Garcia's unrebutted testimony about her discussion with Gardunio concerning the company's accident-reimbursement policy. During that discussion she expressed her concerns about the company's practices, and told him that the drivers were discussing joining a union. (Id. at 235-36.) Second, Garcia was one of several drivers who met with union representatives on December 9, 2010. Martinez carefully avoids saying who she saw leaving the restaurant where the meeting took place, and both she and Gardunio deny that she told Gardunio who she saw. But the record (and common sense) support the ALJ's conclusion that Gardunio's testimony was implausible, and we think the same factors support finding that Martinez's affidavit is likewise not credible. It is unlikely that Martinez and Gardunio would discuss the unremarkable fact that Latino Express employees exited a nearby restaurant without discussing who they were and why they might be there. With respect to the fourth factor, we agree with the ALJ that the timing of Garcia's termination was suspicious. Gardunio fired Garcia the day after she met with union representatives, and approximately three months after she made a non-specific threat about doing "something" to get back at him for making her pay a portion of the accident's cost. (Trans. of Hearing at 318.) There is no evidence

to support the conclusion that the timing and/or severity of the discipline was consistent with company policy. The record indicates that Gardunio once fired an employee immediately for threatening him, and that in another case the company gave a mere "verbal warning" to a driver who was found to have "intimidat[ed]" other employees. (Id. at 689; see also Resp. Ex. 7-D 18 (memo indicating that the company gave a driver a "verbal warning" for "intimidating people.").) This evidence is sufficient to carry the General Counsel's burden to show that Garcia's union activities were a motivating factor in Gardunio's decision to fire her. Finally, the record strongly supports the ALJ's conclusion that Gardunio's purported basis for his decision was pretextual. As we just discussed, the timing of Garcia's termination is highly suspicious. And Gardunio's testimony that he was inspired by a local police officer to "get tough" approximately three months after Garcia threatened him is something the Board could well consider dubious. We conclude that the Director has shown a better than negligible chance that the Board will conclude that Garcia's termination violated § 8(a)(3).

### b. Pedro Salgado

Salgado actively advocated for union participation, (see, e.g., Trans. of Hearing at 361), and the record supports the ALJ's conclusion that company knew about his union activities. (See Trans. of Hearing at 370 (Salgado testifying that Gabino tried to

persuade him that unionizing was not in his and other drivers' best
interests.).)  Moreover, there is evidence in the record supporting
the ALJ's conclusion that Salgado's statements about cash charter
payments at the January 6 meeting were another instance of his open
support for the union.  (ALJ Decision at 16.)  Hernandez plausibly
testified that the cash payments were, from his and Salgado's
perspective, another facet of the unfairness surrounding the
charter assignments.  (Trans. of Hearing at 449-50.)  They agreed
that they would raise the issue at the meeting because they wanted
to put Gardunio's feet to the fire in front of the other drivers.
(Id. at 450.)  Gardunio fired Salgado within a week after the
January 6, 2011 meeting, and in the midst of a plainly contentious
organizing campaign.  We conclude that this evidence is sufficient
to establish a link between Salgado's union activities and his
termination.  Moreover, the record supports the ALJ's conclusion
that the purported basis for Saglado's termination was pretextual.
Salgado plausibly testified that he received cash from Del Toro,
his supervisor, for work he actually performed and that the amount
he received was approximately what he was owed under the company's
charter-assignment policy.  According to Gardunio, this is theft
whether or not Salgado knew what Del Toro was doing with the
company's share of the charter fee.  Even if we accept that
Gardunio sincerely believes his idiosyncratic definition of theft,
it means that Salgado was one of several drivers who stole money

from the company. Only Salgado was summarily terminated. Jose
Rios and Juvencio Montoya were each suspended from work for three
days because they "[a]ccepted money from the charters department,"
and they were ineligible to perform charters for one week. (Resp.
Ex. 5-A & B, 6-A & B.) Gardunio testified that he disciplined a
third employee, Alfonso Avila, but did not provide any employment
record substantiating that claim. (Trans. of Hearing at 657-64.)
There is no evidence in the administrative record that the other
six drivers that Del Toro identified as having taken cash for
charters were disciplined. Gardunio indicates in his affidavit
that the other employees have since been fired, and that the
company has filed a civil lawsuit against them.[12] (Gardunio Aff.
¶ 6.) But the fact remains that Salgado received significantly
different treatment than other employees accused of the same
misconduct. We conclude that the Director has shown a better than
negligible chance that the Board will conclude that Salgado's
termination violated § 8(a)(3).

**B.    The Balance of Harms & Adequacy of a Remedy at Law**

---

[12]/    After briefing was complete on the Director's petition, we allowed
Latino Express to file a supplemental brief calling our attention to the Acting
Regional Director's decision not to pursue retaliation charges against Latino
Express stemming from this state-court lawsuit. (See Letter from G. Moran to P.
Salgado, dated Dec. 7, 2011, attached as Ex. C. to Add'l Resp. to Am. Petition
for Prelim. Inj., at 1 (stating that the Acting Regional Director had decided to
dismiss Salgado's charge because she found insufficient evidence that the lawsuit
was retaliatory).)    However, the Acting Regional Director's decision in that
other matter does not provide any insight into how the Board is likely to rule
in our case. She did not find, for instance, that Latino Express fired Salgado
for a legitimate reason. The Director has shown a strong likelihood that the
Board will conclude that Salgado's termination was improper; the Acting Regional
Director's decision to dismiss Salgado's other charge is irrelevant.

- 32 -

To establish the need for injunctive relief, the Director must show that Latino Express's employees will suffer irreparable harm during the passage of time between the filing of the charges and the resolution of the complaint by the Board and that the employees have no adequate remedy at law. See Spurlino, 546 F.3d at 500-01. In Electro-Voice, our Court of Appeals observed that discharged employees are likely to seek and obtain other employment as time passes, while "the employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them." Electro-Voice, 83 F.3d at 1573. Salgado and Hernandez both testified that other employees have expressed their fears that they will be terminated if management concludes that they support the Union. (Trans. of Hearing at 389-95; 462-65; 466-69.) One employee, Alfonso Avila, told Hernandez that the pro-union employees had "already lost two soldiers" (Garcia and Salgado) and he was concerned that Hernandez would be next. (Id. at 464-65.) Another employee told Hernandez that she was afraid of being seen talking about the Union in front of management, and pretended not to know what Pedro Garcia was talking about when he approached her to sign a pro-union petition. (Id. at 466-69.) There is also some evidence in the record that management's anti-union activities were gaining traction. Hernandez testified that on the day the anti-union speaker addressed (or attempted to address) employees, Ramiro Lopez (another driver) asked Hernandez to sign an anti-union

- 33 -

petition. (See id. at 459; see also id. (testifying that Lopez told him that "anyone who doesn't want the union had to sign that sheet").) And Gardunio testified that in early February 2011 several employees told him that they had requested their signed authorization cards back from the Union. (Id. at 635-36); see A.D. Connor, 807 F.Supp.2d at 729 (finding irreparable harm based in part on evidence that employees were no longer returning a union representative's calls); Regal Health, 632 F.Supp.2d at 833 (similar).

Management's efforts to stifle Union support were unsuccessful insofar as the Union has since obtained Board certification as the employees' bargaining representative. (See Director's Resp. to Latino Express's Supp. Affs. at 13.) But our Court of Appeals has observed that the risk of chilling union participation during the Board's often lengthy adjudication process is particularly high for "fledgling" unions. See Spurlino, 546 F.3d at 501; see also Arlook for and on Behalf of N.L.R.B. v. S. Lichtenberg & Co., Inc., 952 F.2d 367, 373 (11th Cir. 1992) ("The Union was only recently certified by the Board and the employees were bargaining for their first contract. These two facts make bargaining units highly susceptible to management misconduct."). Management's anti-union sentiment is undisputed, and the Director has made a strong showing that the company has gone beyond permissible opposition and engaged in unfair labor practices. (See supra Part A.) We conclude that

- 34 -

employees will suffer irreparable harm awaiting a ruling from the Board, which may take many months, and that a legal remedy would be inadequate to rectify the harm. See Electro-Voice, 83 F.3d at 1573 (finding that the harm caused by a lengthy delay before remedying unfair labor practices is "immeasurable"). Latino Express has not articulated any countervailing considerations. See Nelson v. Napolitano, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."). We conclude that the Director has shown irreparable harm and inadequate remedy at law, and that the balance of harms supports injunctive relief.

## C. The Public Interest

We also examine whether § 10(j) relief is in the public interest, weighing the potential public benefits against the potential public costs. Electro-Voice, 83 F.3d at 1573-74. "[T]he interest at stake in a section 10(j) proceeding is the public interest in the integrity of the collective bargaining process." Francisco Foods, 276 F.3d at 300 (internal quotation marks omitted). The Director has made a strong showing that Latino Express violated the Act, and the public interest is served "by ensuring that [its unfair labor practices] will not succeed" because of the protracted nature of Board adjudication. Electro-Voice, 83 F.3d at 1574 (internal quotation marks omitted); see also

- 35 -

<u>Francisco Foods</u>, 276 F.3d at 300 (Interim relief will "help to preserve the Board's remedial authority and in that way serve the collective bargaining process."). Moreover, there is no evidence that injunctive relief would harm the public. We conclude that interim relief is in the public interest.


**D.    The Requested Relief**

Generally speaking, the relief that the Director requests is appropriately tailored to the violations he has alleged and supported with substantial evidence. (<u>See</u> First Am. Petition for Prelim. Inj. at 11-14.)  Specifically, the Director asks us to enjoin Latino Express from the following prohibited activities: (a) discharging or otherwise discriminating against employees for supporting the Union; (b) coercively questioning employees about their union support or activities;[13] (c) prohibiting employees from discussing with their co-workers issues related to their terms and conditions of employment; (d) creating the impression that employees' union activities are under surveillance; (e) promising improved benefits to employees or soliciting grievances from them

---

[13]/    The requested injunction would prohibit Latino Express from "[i]nterrogating employees by asking them whether they support the Union or another labor organization."  (First Am. Petition for Prelim. Inj. at 12.) Asking an employee whether he or she supports a union may or may not violate the Act, depending on the circumstances.  <u>See</u> <u>Rossmore House</u>, 269 NLRB at 1177-78. The order that the Director submits for our review should prohibit only questioning that "reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act."  <u>Id.</u> at 1177.

- 36 -

in order to discourage union support;[14] (f) threatening to discharge employees or to close the company's facility in response to their union activities; (g) warning employees that it would be futile to engage in union activities; and (h) "in any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act." (Id. at 12.) The Director also asks us to require Latino Express to take the following affirmative actions: (a) within five days of our order, reinstate Carol Garcia and Pedro Salgado to their former positions; (b) temporarily remove from its files any references to the unlawful discharges of Carol Garcia and Pedro Garcia and, within three days thereafter, notify each of them in writing that this has been done and that the discharges will not be used against them in any way prior to a final Board order; (c) within five days of our order, post a copy of the order, together with a Spanish language translation prepared at Latino Express's expense, to be approved by the Director, at Latino Express's facility where notices to employees are customarily posted, maintain the posting during the Board's administrative proceedings, and take reasonable steps to ensure that the order is not altered, defaced, or covered by any other material, and grant agents of the Board reasonable access to the facility to monitor compliance with the posting

---

14/ Soliciting grievances and promising to improve benefits is unlawful only if it is done to discourage union support. See In re Curwood, Inc., 339 NLRB at 1147, 1150. The Director's proposed order should reflect that fact. See, e.g., Baptistas Bakery, Inc., 352 NLRB 547, 552 (2008).

- 37 -

requirement; (d) within 21 days after we issue our order, file a sworn affidavit with this court from a responsible Latino Express official setting forth, with specificity, the manner which Latino Express has complied with the terms of our order, including how the documents have been posted as required by our order, and provide a copy of the sworn affidavit to the Director. (Id. at 13-14.) Latino Express has not articulated any objections to the terms of the proposed injunction. Therefore, we will grant the injunction the Director has requested, subject to the modifications we have just discussed. (See supra n. 12, 13.)

## CONCLUSION

Because injunctive relief is "just and proper," the petition of Joseph A. Barker, Regional Director for Region 13 of the National Labor Relations Board, for injunctive relief pursuant to § 10(j) of the National Labor Relations Act [20] is granted. The Director shall submit a proposed order to the court by April 27, 2012.

DATE:    April 18, 2012

ENTER:   _____

John F. Grady, United States District Judge