## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOSEPH A. BARKER, Regional        )
Director of Region 13 of the      )
National Labor Relations Board,   )
for and on behalf of the National )
Labor Relations Board,            )
                                  )
            Petitioner,           )
                                  )
      v.                          )    No. 11 C 2383
                                  )
LATINO EXPRESS, INC.,             )
                                  )
            Respondent.           )

## MEMORANDUM OPINION

Before the court is the motion of petitioner Joseph A. Barker, Regional Director for Region 13 of the National Labor Relations Board (the "Director") for a rule to show cause and other relief.[1] For the reasons explained below, we find the respondents Latino Express, Inc. and Henry Gardunio in contempt of our order of April 25, 2012, and grant in part, and deny in part, the relief that the Director seeks in his motion.

## BACKGROUND

The Director has charged Latino Express with multiple violations of the National Labor Relations Act ("NLRA"). On April 18, 2012, we held that injunctive relief pending the National Labor

---

[1] We held an evidentiary hearing on the Director's motion on June 12 and 13, 2012.

- 2 -

Relations Board's ("NLRB") ultimate ruling on those charges was "just and proper" under § 10(j) of the NLRA. See Barker ex rel. Nat. Labor Relations Bd. v. Latino Exp., Inc., No. 11 C 2383, 2012 WL 1339624, *1-10 (N.D. Ill. Apr. 18, 2012). We will assume that the reader is familiar with our opinion, which granted in large part the relief that the Director had requested in his First Amended Petition for Preliminary Injunction. See id. at *12. At our request, the petitioner submitted a proposed order consistent with our opinion on April 19, 2012. Four days later, Latino Express moved for 14 days to respond to the proposed order.[2] We held a hearing on the company's motion and ascertained its objections, none of which had even arguable merit. Most relevant here, Latino Express argued that a petition by some of its employees to decertify Teamsters Local Union No. 777 (the "Union") somehow affected the relief provided in the proposed order. We overruled that objection because the Union's current status is clearly irrelevant.[3] The NLRA's protections are not contingent on the existence of a presently-certified union, see 29 U.S.C.A. §§

---

[2] At that point, Latino Express had had notice of the relief the Director was requesting for approximately eight months.

[3] Latino Express also objected to reinstating Pedro Salgado because it had accused him of theft. This matter was extensively explored in the proceedings before the administrative law judge, proceedings the company chose to ignore when responding to the Director's petition. See Latino Express, 2012 WL 1339624, *4. As we discussed in our opinion granting the injunction, Gardunio's accusations against Salgado are "incoherent" and it is likely that the NLRB will find that they were a pretext for retaliatory discharge. See id. at *3. Finally, the company rehashed its argument that it was entitled to a plenary evidentiary hearing on the Director's petition, an argument we had explicitly rejected in our opinion. Id. at *4-5.

- 3 -

157, 158,[4] and no provision of our order depended on, or assumed, certification. The fact that there was a movement afoot to decertify the Union only strengthened the case for prompt enforcement. See, e.g., Lineback v. Spurlino Materials, LLC, 546 F.3d 491, 500-01 (7th Cir. 2008) (observing that "fledgling unions" are especially vulnerable to management misconduct pending the NLRB's often lengthy adjudication process). At the conclusion of the hearing we entered the Director's proposed order. (See Order, dated April 25, 2012, DKT # 42.) Besides enjoining certain NLRA-prohibited activities, our Order directed Latino Express to take the following affirmative steps:

> (a)    Within five (5) days of this Order, offer immediate, interim restatement [sic] to Carol Garcia and Pedro Salgado;

> (b)    Within five (5) days of this Order, temporarily remove from its files any references to the unlawful discharges of Carol Garcia and Pedro Salgado and within three (3) days thereafter, notify each of them in writing that this has been done and that the discharges will not be used against them in anyway [sic] prior to a final Board order;

> (c)    Within five (5) days of this Order, post a copy of this Order, together with a Spanish translation prepared at the Employer's expense, to be approved by the Regional Director of Region 13 of the Board, at Respondent's facility where notices to employees are customarily posted; maintain these postings during the Board's administrative proceedings and take reasonable steps to ensure that the Order is not altered, defaced, or covered by any other material; and grant agents of the

---

[4]    Indeed, all of the violations alleged in the Director's petition pre-date the vote certifying the Union as the employees' bargaining representative. See Latino Express, 2012 WL 1339624, *11

- 4 -

Board reasonable access to Respondent's facility to monitor compliance with the posting requirement;

(d)        Within twenty-one (21) days of the issuance of this Order, file a sworn affidavit with the Court from a responsible official of Respondent setting forth, with specificity, the manner in which Respondent has complied with the terms of the Court's Order, including how the documents have been posted as required by the Court's order, and provide a copy of the sworn affidavit to the Petitioner.

(Order, dated April 25, 2012, at 2-3.)    The respondents do not dispute that our Order bound both Latino Express and Henry Gardunio, the company's vice president and one its owners.    See Fed. R. Civ. P. 65 (d)(2).

The respondents did not perform any of the actions required by our Order on or before the April 30, 2012 deadline: (1) they did not offer Garcia and Salgado reinstatement; (2) they did not remove from the company's files references to their unlawful discharges; and (3) they did not post a copy of our Order, and a petitioner-approved Spanish translation, at the company's facility.    On May 4, 2012, the Director notified Latino Express through counsel that he had received evidence that the company had not complied with our Order. (See Letter from J. Schrand to Z. Smith, dated May 4, 2012, attached as Ex. 2 to the Director's Mot. for a Rule to Show Cause and for Other Relief (hereinafter, "Director's Mot.").)    On May 8, 2012 — a week after the April 30 deadline had passed — Latino Express filed a motion to reconsider and stay enforcement of our Order.    This motion simply restated the company's frivolous

- 5 -

argument that the decertification petition somehow affected our Order.[5]  The following day, respondents' counsel sent a letter to the Director's counsel that essentially ignored the Director's serious accusations of noncompliance.  (See Letter from Z. Smith to J. Schrand, dated May 9, 2012, attached as Ex. 2 to the Director's Mot. (referring the Director's counsel to the company's frivolous motion and stating that the company "[would] review the Court's Order again.").)  We promptly denied Latino Express's motion to reconsider in a brief minute order.  (See Barker ex rel. Nat. Labor Relations Bd. v. Latino Exp., Inc., No. 11 C 2383, DKT # 51 (May 9, 2012).)  It was only at that point that the respondents even feigned compliance with our Order.

### 1.  The Reinstatement Offers

Gardunio sent offers of reinstatement to Garcia and Salgado on May 10, 2012.  The letters placed certain conditions on the offers:

> This is written to inform you that you are being offered immediate, interim restatement [sic] to your previous position.  Please report to work at 6:30 a.m. on Monday, May 14, 2012 ready and able to work as a school bus driver for Latino Express.  Report directly to Mr. Henry Gardunio.
>
> If you do not report to work ready and able to work as a school bus driver for Latino Express on the date above, at the time above, Latino Express will presume that you are rejecting its offer for immediate, interim restatement [sic], and the offer will automatically

---

[5]  It is still unclear exactly what impact respondents believe the decertification petition is supposed to have had on our Order.  The motion to reconsider merely recites certain facts about the decertification petition without any argument or legal authority.

- 6 -

expire.

(Letter from H. Gardunio to C. Garcia, dated May 8, 2012, attached as part of group Ex. 8 to the Director's Mot. (emphasis added); see also Letter from H. Gardunio to P. Salgado, dated May 10, 2012, attached as part of group Ex. 8 to the Director's Mot. (letter to Pedro Salgado containing identical language).)[6] Garcia and Salgado received the letters on May 11, 2012, the Friday before the Monday they were to report for work.

The phrase, "ready and able to work as a school bus driver," is a thinly-veiled reference to the license and permit requirements applicable to school bus drivers in Illinois. After Latino Express fired Garcia and Salgado on December 10, 2010 and January 12, 2011, respectively, they received notice from the Illinois Secretary of State's office that their school-bus driving permits, valid for one year, were going to expire. In order to renew their permits, they were required to take a four-hour training course (called a "refresher" course), pass a physical examination, and pay a $4 re-application fee. As we discuss in more detail later in this opinion, they also needed a current or prospective employer to certify that they had satisfied all statutorily-required "pre-employment conditions." (See School Bus Driver Application/Certification, attached as part of group Ex. 15 to

---

[6] Although Garcia's offer letter is dated May 8, 2012, it is undisputed that respondents mailed both offers on May 10, 2012.

- 7 -

Director's Mot., at 2.) Garcia and Salgado, who were unemployed at the time, could not provide the necessary certification.[7] Thirty days after their permits had expired the permits were no longer eligible for renewal. After that, Garcia and Salgado could only apply for new permits, which required completion of the following steps: attend a twelve-hour training course, pass a written examination and road test, successfully complete a background check (including fingerprint identification), and pass a physical examination. They also needed an employer to verify that they had completed these steps, and to provide the "Certification" we just described. (See School Bus Driver Application/Certification at 1-2.) Again, Garcia and Salgado could not have completed these steps without an employer's assistance.

Latino Express relies on a portion of its employee handbook stating that it is its employees' "responsibility to have [their] physical and State of Illinois papers filled out promptly and completely." (See Employee Handbook, attached as Ex. I to Respondents' Resp. to Director's Mot.) We accept that the company's policy requires employees to attend the state-mandated classes, submit to the physical examination, etc. But this is an

---

[7]/ During the contempt hearing the respondents faulted Garcia and Salgado for not reaching out to Latino Express for assistance with their permit renewals. Garcia and Salgado were fired on trumped up charges of intimidation and theft, respectively. They had no reason to think that the company would assist them. And if there had been any doubt, the reinstatement letters, requiring them to show up with valid permits on the next work day, make it abundantly clear that it would have been futile to ask the company for help.

incomplete statement of the policy. First, as we just indicated, Latino Express is required by law to complete some of the steps necessary for its employees to obtain and renew their permits.[8] Second, the company provides substantial assistance to its employees in all aspects of the permitting process. A Latino Express employee schedules and conducts the required classes and administers the road test. The company schedules the employees' physical examinations at a clinic that it selects and gives the employees forms for the clinic staff to complete. It arranges to have its employees fingerprinted, and to have their backgrounds checked. All the fees associated with this process are paid by Latino Express to the relevant third-parties, and then a portion of those fees is later deducted from the employees' paychecks.[9]

Gardunio denied knowing that Salgado and Garcia did not have their permits when he sent the offer letters, testifying that he only learned that fact the day before they were to report for work (a Sunday). As we discuss at other points in this opinion, we take a very dim view of Gardunio's credibility, and we find this particular testimony implausible. Several witnesses testified that

---

[8] Patricia Smith, a current Latino Express employee, testified that a mistake by Latino Express caused her permit to expire. Even though she could not legally transport children to school, the company continued to pay her salary while she completed the requirements to obtain a new permit.

[9] At one point during his testimony, Gardunio suggested that the company does this as a courtesy to its drivers. In fact, the company is subject to significant fines if it allows a person without a permit to drive a school bus. See 625 ILCS 5/6-106.11.

the company keeps a record of its drivers' permit status. And while Gardunio might not personally keep tabs on the drivers' permit status in the ordinary course of business, the circumstances of Garcia's and Salgado's reinstatement by court order were hardly ordinary. The pointed references to their "ability" to drive a school bus as a condition of their reinstatement strongly indicates that Gardunio knew that their permits had expired when he sent the letters. Garcia and Salgado reported for work, as directed in the letter, on Monday May 14, 2012. Gardunio confronted them with the fact that they did not have their permits and told them that they had not complied with the offers' terms.[10]

## 2. The Posting Requirement

Gardunio testified that our Order was posted at Latino Express's facility on May 10, 2012, more than a week after the deadline to post the Order had passed. He further testified that a Spanish translation was posted that same day and submitted to the Director for approval per our Order. The company's version has a number of apparent translation errors, and portions of our order are not translated at all. The Director submitted a corrected version to Latino Express on May 11, 2012, and Gardunio testified that it was posted on the company's bulletin board that same day.

---

[10] Gardunio testified that Salgado falsely stated that he had his permit when he reported to work on May 14. It is implausible that Salgado would lie about his permit status when he knew that he could not produce a permit in response to Gardunio's inquiry.

We conclude that this testimony is false for two reasons. First, Gardunio was evasive about the circumstances surrounding the posting. In a pre-hearing affidavit he stated that he personally removed the previous version and posted the Director-approved version on May 11, 2012. (See Gardunio Aff., dated May 31, 2012, attached as Ex. G to Latino Express's Resp. to Director's Mot., ¶ 3.) He backed away from that statement during the hearing, implausibly testifying that he could not remember whether he had posted the corrected version or if he had directed someone else to do it. He was confident, though, that it had been posted because he noticed after May 11, 2012 that the order on the bulletin board looked different than the previously posted version. At the same time, he denied reading it entirely or examining it closely. Second, Carlos Garcia, a current Latino Express employee, testified that he saw the previous version posted on the company's bulletin board continuously until May 29, 2012. Photographs taken by Mr. Garcia on May 25, 2012, displaying the old version, and on May 29, 2012, showing the approved version, corroborate his testimony. The Director effectively concedes, however, that there are no significant substantive differences between the two versions.

## **DISCUSSION**

**A.  Legal Standard**

To establish that the respondents are in contempt of our order, the Director must show the following by clear and convincing

- 11 -

evidence: (1) our order "sets forth an unambiguous command;" (2) the respondents "violated that command;" (3) the "violation was significant, meaning [they] did not substantially comply with [our order];" and (4) they "failed to take steps to reasonably and diligently comply with" our order. Prima Tek II, LLC v. Klerk's Plastic Indus., B.V., 525 F.3d 533, 542 (7th Cir. 2008).

## B.    The Reinstatement Letters

The Director has shown by clear and convincing evidence that the respondents are in contempt of the provision of our Order directing Latino Express to offer immediate, interim reinstatement to Salgado and Garcia by April 30, 2012. First, respondents failed to make any offer until May 10, 2012, more than a week after the clear deadline imposed by our order. In their defense, the respondents have repeatedly invoked May 9, 2012 — the day we denied Latino Express's motion to reconsider — as the relevant date against which to measure their compliance. As we previously stated, the respondents' argument that decertification somehow affected our order was substantively baseless. We rejected the argument as baseless on April 25, 2012, before we even issued our Order. Meanwhile, the deadline to offer reinstatement came and went without any action by the respondents. Latino Express then filed a motion to reconsider and stay our order on grounds that we had already rejected. The respondents' defense boils down to this: they believe that they were entitled to ignore our Order because

they disagreed with it.  We find by clear and convincing evidence that the respondents failed to take reasonable and diligent steps to comply with our Order before April 30, 2012.  This violation alone is sufficient to support a finding of contempt.

We also find by clear and convincing evidence that the belated offers were illusory, in further violation of our order.  It is the company's practice to assist its employees in obtaining their school-bus permits.  Respondents did not offer to extend the same assistance to Garcia and Salgado, requiring instead that they report for work on unreasonably short notice with current permits. The respondents criticize Garcia and Salgado for not maintaining their permits during their extended period of unemployment.  But the only evidence supporting the company's contention that this was even possible is Sara Martinez's self-contradictory testimony.[11] In response to our questions, Martinez testified that a person needs an employer to obtain a new permit, but not to renew an existing permit.  Later, in response to questioning from respondents' attorney, she reversed herself and stated that a person can obtain both a new permit and a renewal without an employer.  Neither version of Martinez's testimony can be squared with the relevant statute and the form permit application provided by the Secretary of State.  The statute establishing the permit requirements imposes certain duties on employers:

_____

[11]/  Martinez currently works for Latino Express as a manager and bus dispatcher.

- 13 -

Applicants shall obtain the proper application required by the Secretary of State from their prospective or current employer and submit the completed application to the prospective or current employer along with the necessary fingerprint submission as required by the Department of State Police to conduct fingerprint based criminal background checks on current and future information available in the state system and current information available through the Federal Bureau of Investigation's system.

[. . . .]

The employer shall be responsible for conducting a pre-employment interview with prospective school bus driver candidates, distributing school bus driver applications and medical forms to be completed by the applicant, and submitting the applicant's fingerprint cards to the Department of State Police that are required for the criminal background investigations. The employer shall certify in writing to the Secretary of State that all pre-employment conditions have been successfully completed including the successful completion of an Illinois specific criminal background investigation through the Department of State Police and the submission of necessary fingerprints to the Federal Bureau of Investigation for criminal history information available through the Federal Bureau of Investigation system. The applicant shall present the certification to the Secretary of State at the time of submitting the school bus driver permit application.

625 ILCS 5/6-106.1(a) and (d). The application form requires the applicant to provide personal information (name, address, etc.), and to sign a declaration affirming certain statements relevant to the applicant's qualification to receive a permit and consenting to the disclosure of driving-record information to the Illinois State Board of Education and to the applicant's "employer." (See School Bus Driver Application/Certification at 1.) A separate section directs the applicant's employer to confirm that the applicant has

- 14 -

completed the necessary steps to obtain a new permit: physical examination, "pre-employment interview," criminal background check, and classroom training. (Id.) The employer must also certify that the applicant "has successfully completed all the required pre-employment conditions in accordance with Section 6.106.1(d) of the Illinois Vehicle Code [625 ILCS 5/6 106.1(d)]." (Id. at 2 ("Certification").) Clearly, a person cannot obtain a new bus permit without a current or prospective employer's assistance.

We also conclude that, contrary to Martinez's testimony, a current or prospective employer's assistance is required to renew an existing permit. The statute states that permits are "renewable upon compliance with subsection (a) of this Section." 625 ILCS 5/6-106.1 (b). Subsection (a) requires, among other things, that applicants obtain the "proper application required by the Secretary of State from their prospective or current employer and submit the completed application to the prospective or current employer . . . ." See id. at 5/6-106.1(a). The statute simply does not contemplate a person unaffiliated with an "employer" obtaining, or maintaining, a permit to drive a school bus. This is confirmed by the Secretary of State's website, which provides that "[i]n order to renew your school bus permit, you must . . . [m]ail an official application completed by your employer . . . ." (See "School Bus Permit" Requirements, available at http://www.cyberdriveillinois.com/departments/drivers/drivers_lic

ense/schoolbus.html, attached as part of group Ex. 15 to Director's Mot.) It is also confirmed by the renewal notice that Carol Garcia received from the Secretary of State's office. (See Letter from J. White to C. Garcia, dated May 27, 2010, attached as part of group Ex. 16 to Director's Mot.) The notice states that her "employer must complete a School Bus Application/Certification form verifying" that she has completed the required physical examination and the annual refresher course. (Id.)[12] Indeed, Martinez executed a renewal application for Garcia during Garcia's previous employment with Latino Express. (See Garcia's School Bus Driver Application/Certification, executed July 20, 2012, attached as part of group Ex. 16 to Director's Mot.)

By requiring Garcia and Salgado to show up to work on May 14, 2012 with valid permits, respondents imposed a condition that Garcia and Salgado could not have satisfied.

We have doubts about whether Martinez and Gardunio, who echoed Martinez's testimony, genuinely believed that it was possible for Garcia and Salgado to maintain their permits while they were unemployed. It appears that Martinez routinely completed applications for the company's drivers, and when pressed at the hearing she could not articulate the basis for her understanding

---

[12]/ During Garcia's testimony, we admitted all the documents attached to the parties' written submissions except for Garcia's and Salgado's affidavits. When the Director later attempted to examine Salgado using *Garcia*'s renewal notice, we sustained respondents' objection because we were under the impression that the exhibit was not in evidence. Pursuant to our earlier ruling, however, the renewal notice was in evidence and we may consider it here.

- 16 -

that an employer's assistance is not required.[13]

In any event, it is clear that the respondents acted in bad faith by requiring Garcia and Salgado to report ready for work on Monday (i.e., with valid permits) as a condition of reinstatement. Respondents must have known that Garcia and Salgado would expect the company to shepherd them through the permitting process — either on an "initial" or a "renewal" basis — if it offered to reinstate them to their former positions.  That is what the company had done before they were fired, and the evidence establishes that it is still the company's practice.  When they had received the renewal notices from the Secretary of State, they could not have anticipated the respondents' eventual gambit of conditioning reinstatement on reporting the next work day with valid permits. And once they received the reinstatement letters and realized what the company was up to, it was too late to do anything about it. Gardunio, acting on Latino Express's behalf, did not "reasonably" and "diligently" attempt to comply with our Order.  He disingenuously seized on what he saw as a loophole in the Order and tried to exploit it.

**C.    The Posting Requirement**

---

[13]/  It is possible that Martinez was confusing the permit prerequisites and the employer's verification that the applicant has completed them.  So, for example, it may be possible (as Martinez testified) for a person to attend a refresher course without having a current or prospective employer.  But as we have just discussed, the employer's verification is an integral part of the permit process.  Without that verification, Garcia and Salgado could not have maintained their permits, and that is the condition imposed by the reinstatement offers.

The posting requirement is an important part of our Order as it signals to employees that their employer cannot violate their rights under the NLRA with impunity. For the reasons we discussed in connection with the reinstatement letters, we find the respondents in contempt for failing to post our Order on or before April 30, 2012. They made <u>no</u> attempts to comply with this unambiguous requirement, and their defense is frivolous. We further find that the respondents failed to post the Director-approved Spanish version of our Order before May 28, 2012, contrary to Gardunio's vague and evasive testimony that it was posted on May 11, 2012. Given the apparently harmless differences between the two translations, it is unlikely that the delay between May 11 and May 28 gave the respondents any real advantage in their ongoing dispute with Union supporters. But it further underscores their disregard for our Order.

## D.  **Relief**

The Director brings his motion pursuant to Fed. R. Civ. P. 70(e), and consistent with the legal basis of the Director's motion, we have imposed procedural requirements consistent with civil (not criminal) contempt. <u>See</u> <u>Federal Trade Commission v. Trudeau</u>, 579 F.3d 754, 769 (7th Cir. 2009) (describing the procedural requirements for both criminal and civil contempt sanctions). So, it would be inappropriate to award relief that is punitive rather than remedial and/or coercive. <u>See</u> <u>id.</u> For that

- 18 -

reason we decline to impose the flat "compliance fines" that the Director requests. (See Director's Mot. at 10-11 (asking us to order Latino Express and Gardunio to pay the NLRB $5,000 and $2,500, respectively); see also Trudeau, 579 F.3d at 769 ("[A] criminal contempt sanction is "a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt ... [where] the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance.'") (quoting International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 829 (1994)). We also decline to impose the fines that the Director seeks for future noncompliance with our April 25 Order. (See Director's Mot. at 11.) Although such relief would be coercive, rather than punitive, we believe that the relief provided below is more narrowly tailored to the respondents' violations.

We will require the respondents to re-offer Garcia and Salgado reinstatement as set forth in the Director's prayer for relief. (See Director's Mot. at 8-9.) The Director also asks us to require the respondents to post our contempt order and this opinion at Latino Express's premises, together with Spanish translations. We do not believe that posting a lengthy opinion on a common-area bulletin board would be useful to employees, and from what we can gather from the record, translating it into Spanish would be burdensome. However, we will order respondents to post copies of our contempt order, along with a Spanish translation prepared at

- 19 -

respondents' expense. Given the respondents' conduct to date, we will impose a $1,000 per day fine against Latino Express, and a $500 per day fine against Gardunio, if they: (1) fail to offer reinstatement to both Garcia and Salgado within the time, and in the manner, provided in our contempt order; and/or (2) fail to comply with the posting requirement set forth in the order.  See Trudeau, 579 F.3d at 769-70 (a monetary sanction that the respondent can avoid by complying with the court's order is coercive, and therefore civil).

We will also award monetary relief as follows.  Respondents shall pay Garcia and Salgado backpay, which appropriately compensates them for the respondents' noncompliance.  Our Order contemplated that Garcia and Salgado would have the opportunity to resume their employment at Latino Express on April 30, 2012, at the latest.  Backpay shall be computed from that date through and including the date on which respondents again offer reinstatement as provided in our contempt order.  The respondents shall provide the Director with the payroll and other records necessary to make the backpay calculation.  The Director asks us to impose interest on the backpay award "as computed in Board proceedings." (Director's Mot. at 9.)  We understand that the Board imposes compound daily interest at the rate prescribed in the Internal Revenue Code for the underpayment of taxes.  See Jackson Hospital Corporation, 356 NLRB No. 8, 2010 WL 4318371 (N.L.R.B.), *5-6

- 20 -

(imposing compound daily interest); <u>New Horizons for the Retarded</u>, 283 NLRB 1173, 1174 (1987) (imposing the short-term Federal rate plus three percent, per 26 U.S.C.A. § 6621).  We conclude that this method of computing interest adequately reflects the time value of money.  See <u>Jackson Hospital Corporation</u>, 356 NLRB No. 8, 2010 WL 4318371 (N.L.R.B.), *4 (concluding that compounding daily interest reflects actual commercial lending practices); <u>New Horizons for the Retarded</u>, 283 NLRB 1173, 1173 (observing that "the short-term Federal rate is based on average market yields on marketable Federal obligations and is influenced by private economic market forces").

We will also require the respondents to pay the Director's costs and expenses (including reasonable attorneys' fees) incurred in investigating and prosecuting this contempt proceeding. Taxpayers should not bear the cost of the respondents' willful disregard of our Order.  Those costs and expenses shall include the costs the Director incurred translating our Order into Spanish. The respondents effectively admit that the version they belatedly submitted to the Director for approval was slapdash, which is inconsistent with a reasonable and diligent attempt to comply with our Order.

In order to ensure compliance with our contempt order, respondents shall grant the Director reasonable access to Latino Express's facility.  Based on statements made by respondents'

- 21 -

counsel during the contempt hearing, it appears that respondents believe that the phrase "reasonable access" in our April 25 Order entitles them to significant advance notice of inspection (and a sporting chance to disguise noncompliance). "[R]easonable access" means access during normal business hours, for a reasonable duration, and with reasonable frequency. The Director <u>may</u> conduct surprise inspections of Latino Express's facility to ensure compliance with our order.

Finally, respondents shall file an affidavit with the court setting forth the specific steps they have taken to comply our contempt order.

## <u>CONCLUSION</u>

The petitioner's motion for a rule to show cause and for other relief [54] is granted in part and denied in part. The Director may prepare and submit a proposed contempt order in conformity with this opinion by July 9, 2012. The respondents may file any objections to the form of the order by July 12, 2012.[14]

---

[14] When we enter the order, we will set a time for the Director to file his petition for costs and attorneys' fees and a time for respondents to answer. We may need a separate briefing schedule on backpay if the parties are unable to reach agreement.

- 22 -

DATE:        July 2, 2012


ENTER:      _____

              John F. Grady, United States District Judge